Case No. 25-1827, Lori Vilo v. Kent County MI et al. Argument not to exceed 15 minutes for appellant, with 15 minutes to be shared by appellees. Ms. Miller, you may proceed for the appellant. Thank you very kindly, Madam Clerk. Good morning. Welcome to Detroit. If you haven't been here before, I hope you enjoy your stay. Thank you. May it please the Court, Racine Miller appearing on behalf of the plaintiff appellant. I'd like to reserve three minutes for rebuttal. I did note on the door that there's an indicator that this case is arising from treatment of a brain tumor. That's not the case here. The brain tumor wasn't discovered until afterwards. This is a case that presents a 14th Amendment question whether a detainee's weeks-long visible medical deterioration marked by escalating neurological symptoms can be dismissed at summary judgment by reframing it as a mere disagreement over treatment requiring proof. The District Court answered that question incorrectly by applying the wrong legal standard at each step and by resolving factual disputes that should have been left to the jury. This appeal turns on three main reversible errors. First, the District Court misapplied Blackmore by treating Mr. Maslowski's obvious neurological emergency as a Napier-style inadequate treatment claim that required verifying medical evidence. Second, the District Court failed to apply the brawner reckless disregard standard to the defendant's actual knowledge and deliberate actions and inactions. Third, even assuming that the anaplastic oligodendroglioma brain terminal, genuine issues of material fact exist on the unnecessary pain and suffering because the jail failed its independent duty to provide palliative care and aggressive intervention. The record reflects weeks of escalating neurological symptoms, severe headaches, vomiting, and seizure-like behavior. And the question here is whether a reasonable jury could find that the defendants failed to respond adequately to that obvious risk. The District Court answered that question by requiring verifying medical evidence, by applying a subjective awareness standard inconsistent with brawner, and by resolving disputed factual inferences at summary judgment. Can I ask about that? Do we apply the brawner standard in this case? Was the brawner case decided after the events in this case? And if so, does that mean that we apply the farmer standard here rather than brawner? If that were the case, we can still go with farmer, and farmer still supports our position here today. Thank you. Sorry, I just wanted to make sure we were on the right page. Can I ask you one other question then? So when Mr. Maslowski was checked in, or entered the facility, I think he indicated that he had no serious medical issues? The Sixth Circuit precedent indicates that where symptoms are obvious, as they were— Well, can I start? So you agree, just factually, right? He doesn't—am I right? I mean, first factually, am I right about that? No, you're not right about that. He actually reported that he had, before making entry into the facility, been struck in the head with a pipe, among other ailments. So he did, upon intake, disclose a variety of medical and mental issues. Okay, but he didn't disclose anything regarding like a brain tumor or cancer or anything like that? No, he did not. There was— Did he know? Did he know? Do you know? Or is that in the record? Upon information and belief, after the fact, it was learned that in 2019 he had been diagnosed, but he was mentally suspect and mentally infirm, which is throughout the record. So whether or not he knew or told about the tumor, that's not really pertinent to the case. Yeah, so then your legal point—I cut you off—your legal point then was the Sixth Circuit says—I was kind of asking a factual question. You were starting to give a legal answer. So what was your—you can go back to the legal—you're going to give us the legal standard, I think, for how we should consider a circumstance where the party doesn't disclose the medical issue that then results in, in this case, unfortunately, death. Sure, and I'm going to get there closer to the end as well. But in this case, even if you want to apply farmer, you do have to have that objective scope. You have to look at it and say, what were the symptoms? Were they obvious to a layperson? And you can't really rely on an inmate's self-diagnosis in any event. So let's say that, just for the sake of argument here, that we agree with you on the objective prong, and maybe that it was misapplied. On the subjective prong, and you've said even if we apply farmer, he still should have prevailed. One of the difficulties that I had was that there was not—I didn't see an individualized discussion of each of the defendants in terms of how—if it was reckless, how they were reckless. If it was they actually appreciated the risk and failed to act in the face of an obvious risk, or a risk that they appreciated, I should say. I didn't see that breakdown. So maybe if you could just walk me through the defendants and how that applies to each of them. Absolutely. And I thank you very much for that question. There was actually a stipulated joint statement of facts that had been submitted in the lower court, and everybody is on the same page with who did what. Let me get you there. Well, yeah. So I want to be clear. My question is not who did what. My question is, what of what they did actually satisfied the legal standard that had to be satisfied for each of the defendants? Okay. It's what they didn't do in the face of known and obvious escalating symptoms. Here's why I'm asking that question. Because if you put out a timeline, I don't know that there's any particular defendant who saw an escalation. Each one of these defendants appears to me to have done particular things on particular days. Whether or not they had knowledge or should have known that this happened, that he reported that he was struck in the head with a pipe and potentially had a concussion on this day, that he threw up on this day, that he complained of an excruciating headache on another day. That matters for the subjective prong, does it not? This was not a stranger to this facility. They knew him. He had a history, and they Which of them knew? The subjective prong is just that. It's subjective. So I guess what I'm trying to get you to do is to specify. I mean, we've got a number of defendants here, and their claims are individual, correct? I'm sorry? Your claims against them are in their individual capacities, correct? Yes, Your Honor. So that's what I'm trying to get to. I'm trying to tease out what for each defendant you're saying. Yes, Your Honor. Nurse Lucas on March 9th knew that there were flashing lights that he was seeing, and she failed to report it. Nurse Rawls on April 14th. Well, let's stick with Nurse Lucas. So you're not saying that on one occasion she failed to report something, and that shows that she knew that there was this escalation in his condition, are you? There was more than one instance that each and every one of these defendants were aware of. When he first came in, there were things going on, and then almost every single day for the two weeks, there was something that was happening with this man, and they each knew. And if you want me to go per defendant on which day and what they knew, I can. I believe that's in the briefs. Is that what you're seeking here today? It is what I'm seeking, and I don't know that that was in the briefing. Okay. So maybe it's helpful to start kind of maybe towards the end when things and the symptoms were more extreme and things like that. So like April 14th, April 15th, I think it's nurse-to-graphs evaluations those days or things like that. What there and what happens at the end in those days do you think demonstrates the subjective prong as Judge Davis is asking? Sure. So you're now asking about the facts that happened on the 14th and 15th? And how they meet the legal standard for the subjective prong. Sure. On the 14th and the 15th, those were the two dates, and the 16th when he ultimately fell unconscious. Those were the dates when he stopped eating and he was vomiting and he was unresponsive. Nurse-to-graph came in. By the time nurse-to-graph came in, he had been roused, but he had urinated on himself. And I think the folks stationed on those two days were Vander Molen and Calder, and I don't want to misspeak here. I apologize. But for the deputies, I want to say that to the extent they tried to rely on medical staff, for example, DeGraff or Lucas or some other nurse who said it was anxiety or stress, the jailers can only rely on the medical opinions and assessments to the extent that nothing new has happened. Once something new happens and it escalates, they had a duty, the COs, to do something more. And there was even testimony that they had the ability to call 911. So insofar as the reliance on the medical, that's not absolute. I think what you wanted to know more about is the subjective prong, whether the risk was so obvious or that it was known or should have been known. Our position is that each and every one of the defendants deliberately failed to act in the face of obvious symptoms. There was severe pain and a nurse Rawls promised to send someone but never did. There was a seizure that was actually witnessed by David DeGraff. He said, well, it's possibly anxiety, although the inmate said this has never happened to me before. And the defendant deputies, McNeil, Fenema and Ritz . . . The seizure was witnessed by the nurse? The second seizure, I do believe, was witnessed by the nurse. Okay. And as to the defendant deputies, McNeil, Fenema and Ritz, they all knew of his history and they still deferred to the medical anxiety assessment without taking any independent action. That's where the constitutional duty that they had was violated. Under the correct standard, had the court below applied it, whether the risk was so obvious that failing to act was objectively reckless, that should have gone directly to the jury. There were repeated complaints, there were worsening symptoms, there was visible deterioration, and there was no meaningful escalation of care that should have gone in tandem with the escalation of symptoms. This gentleman was disregarded as he probably has a headache from banging his head on the door. Well, maybe he was banging his head on the door because of the head pain. In any event, screaming and persistent pain and remains unresolved after a medical assessment is certainly something that is objectively obvious and ought to have been escalated and in this case was not. With respect to the seizure, didn't the seizure happen sort of like in the afternoon? Yeah, two of them. Yes, sir. I'm thinking about the one on the 15th. Yes. And then like hours later, he was in the hospital. That's correct. And immediately preceding the first seizure-like activity, he was vomiting, he wasn't eating. They actually had him scheduled for a medical visit a couple of days out, but the days preceding his demise, there was a clear reported escalation of his symptoms and his request for help, and he never got- I'm just making the point that he did get to the hospital within hours? Of the second seizure, yes. They waited until he seized and became unresponsive before they took him out for treatment. May I quickly, briefly talk about two things that didn't have anything to do with the objective? I have one point. Can you give your best point? Sure. You have some rebuttal, too. Thank you. I will reserve for rebuttal. As to the Monell, we don't really have to brief it as thoroughly as the court did to go through the Rule 56 criteria and determine whether or not defendant met their burden. And as to the fees, the court below abused its discretion, did not take into consideration the fact that the personal representative of the estate was indigent, didn't consider those factors when assessing costs. I'll come back for more in rebuttal. Okay. Thank you. Thank you. Good morning and may it please the court. I'm John Cardello. I represent the medical defendants in this case. So, at the outset, this case is and always has been about an allegation of inadequate medical care. That's in the operative amended complaint. The plaintiff herself admitted that at her deposition. It puts us squarely within the framework of NAPIER. And, of course, NAPIER requires that the plaintiff place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment. There is no verifying medical evidence. There's no expert testimony. It fails to meet NAPIER. Even how plaintiff's counsel is casting this from the objective standpoint, while they were escalating neurological symptoms, well, right then and there, that's not a Blackmore situation where you have an obvious, immediate, emergent, urgent need that has to be immediately dealt with and it wasn't. So, again, we're in NAPIER. We're in a case involving an allegation of inadequate medical care. There has to be verifying medical evidence placed in the record by plaintiff that typically, according to the Sixth Circuit, is going to take the form of expert medical testimony. There is none. Can I ask you, quite frankly, I find some of our cases a little difficult. To square and understand about when we need verifying medical evidence at the first step and what it means to kind of like get treatment enough that now you're kind of in NAPIER world as opposed to our general objective test world. And in NAPIER, for example, which you're invoking, you have somebody who has a, you know, a diagnosed issue. People know what it is. There's a treatment plan. There's questions about deviating from a treatment plan, right? And other cases that we have, quite frankly, sound a little bit more like this one where people don't know exactly what's going on, right? We don't know the tumor here. And there are symptoms of illness and they're getting treated for symptoms, right? And we don't require, you know, strict medical verification. I'm thinking about our very recent case in Harrah, for example, just last year. And so I'm trying to figure out when, what amount of treatment, what kind of treatment plan kind of invokes this medical expert requirement. I think that when there has been treatment and treatment has been ongoing and when the allegation is like in this case that, well, they would have, could have, should have done something more, better, different. I think in that case you have to have, the plaintiff has to have an expert verifying that, yes, this treatment was inadequate given. So if somebody is just vomiting, right, which is something that we have said meets the objective test in many cases, right? This is kind of obviously something is going wrong if you're vomiting and continuously vomiting. If, let's say, over a course of four days they treat you for, you know, your continuous vomiting, they give you Zofran, maybe some Prilosec, you know, they're checking on you, there are things, there are things like that. Do you fail the objective prong if you don't have verified medical evidence that this treatment wasn't enough? I think so if it ultimately results in, say, well, somebody, let's take in my example, then they discover that somebody has, they die after four days and really there was an underlying cause was diabetes, right? Do you need objective medical evidence in that case? I think so because. Okay, so we said in the case in error under exactly those facts, I'll just read it to you, to be sure the inmate may well have met the objective prong, right? A lay person would easily recognize the necessity for a doctor's attention. We didn't require, we didn't say, hey, you've got to have an expert in that case. And I'm trying to figure out how this one is different. I guess I just think it's different, Your Honor, because, you know, the allegation is that there are these escalating neurological symptoms which would require an expert to say that they were, in fact, evidence of a serious neurological problem. Because that's the allegation, that they ignored what they should have seen. They should have seen this underlying neurological problem. Well, how do we know if that's true unless we have an expert saying that, yes, based on what these defendants were seeing, they should have seen that this was a neurological problem and done something different? But isn't that kind of getting us into the subjective prong, which I actually think those arguments may be quite strong for. Like, look, they saw these symptoms. They weren't deliberately indifferent to them. They treated them. They did what their medical training told them to do when they see this type of thing. That at least sounds to me as an argument going to the subjective prong. Yes, and actually, I'm glad you said that because it's a good segue into the subjective prong. And I think you're right because this whole requirement about whether there needs to be expert testimony on behalf of the plaintiff, I think it does spill over into the subjective prong quite nicely. And I really think that there's overlap because in the subjective prong, and even if we go with Brawner, the lower standard. Well, what should we, I mean, even if. What do you think the right answer is? Well, I'll be honest, Judge Riedler, I hadn't thought about that. I didn't. I was admittedly assuming that. That's okay. That's all right. Go ahead. Yeah, as long as he's a pretrial detainee and going to go with Brawner. And again, I'm fine with that. But again, to your point, Judge Bloom-Katz, I hope I'm pronouncing that right. Again, it does go to the subjective component because the plaintiff has to show that defendants acted deliberately and recklessly in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known. Okay. As you said, Judge Davis, we have to look at each defendant individually. We have to look at what they knew or obviously should have known at the time. And before you get into that, do you agree, though, with counsel that clearly his condition was escalating? I honestly don't because throughout the, I think it was a span of two weeks, you know, he pretty consistently was complaining of headaches, mostly headaches and stomach aches. And he was being seen for it. He was being treated for it. He asked for a change in medications. He was given a change in medications. He said that he was losing weight. They did BMI tests. He wasn't losing weight. They gave him crackers. The NP Sherwood issued an order to give him crackers with his medication. So, you know, was it escalating? I don't think so necessarily from the standpoint of the defendants when you look at them from an individualized context. Again, one thing on the record I want to make clear is that plaintiff's counsel alleges that Nurse DeGraff witnessed a seizure, did not witness a seizure. It's in the record. It was the correctional staff that allegedly witnessed a seizure. They called Nurse DeGraff. He came, did a neurological assessment, checked his eyes, checked his grip. He seemed to be okay. At that point, Mr. Maslowski was more concerned about getting a toothbrush, which he got. So, again, were there any symptoms or complaints considering each? Oh, I'm sorry. That's okay. Why don't you finish that statement, and I think Judge Davis has a question for you. Okay. Again, I think if you consider each defendant individually as the court's required to do, you'll see that they responded appropriately to the symptoms. There was no recklessness. There was no disregard of anything with Mr. Maslowski. So I think you've stated that that is something of a concern. But I do have one question for you. So one of the consistent complaints that he was making was that he had a headache, and he gave information that he had a concussion. And there's nothing in the record suggesting that any medical provider did anything remotely close to a concussion protocol or anything like that. So from that perspective, of him fairly early on saying that, hey, I got hit in the head with a lead pipe and I have a concussion, and alternating between Excedrin and something else, I don't know, that strikes me as a little bit strange. Well, again, it's self-reported, and so, you know, I think that the medical defendants would say he reported a concussion. We don't see symptoms of a concussion, like bleeding in the ears. There's complaints of headaches. Well, but there's nothing in the record saying what the examination was for a concussion, per se, is there? I didn't see anything in the briefing. No, not that I'm aware of. But, again, I would say it's a malpractice issue. It's not a deliberate indifference issue. But thank you, Your Honor. Okay, thank you. Good morning, Your Honors. You may please the court. My name is Neil Youngdahl. I represent the Kent County defendants. In my limited time here today, unless the court has questions for me on specific arguments, I thought I would focus on three issues that are kind of unique to my clients and the combination of which creates kind of the most direct path to affirming the district court's judgment from the Kent County defendants' perspective. Those three issues are qualified immunity, the proper disposition of the Monell claim against Kent County and the sheriff, and then the tax cost issue. On qualified immunity, beyond the underlying merits of the objective component and the subjective component and causation, qualified immunity's clearly established prong provides an independent ground to affirm the district court's judgment here. We raised this argument in the district court level so it's properly preserved, but the district court concluded that it did not need to reach that issue based on its other rulings. We re-raised that argument in our appellate brief, and once we did so the burden shifted to the plaintiff to establish that as of March 2021, clearly established law demonstrated that the deputy's reliance on the judgment of medical professionals was unconstitutional under these circumstances. The estate failed to do so. In fact, qualified immunity is not even mentioned in the reply brief, so the question of clearly established law in this case has not even been addressed. Given this, the estate has effectively waived any argument against application of qualified immunity in the deputy's favor on the deliberate indifference claim. I also think this kind of goes to Judge Radler's question as to what standard applies. I think the court's precedent for this time period before Brawner was issued, whether or not Brawner is retroactive or not, I think is a little unclear. I know there was a recent case where the court touched on this issue that came out after our briefing, but I think the way that you kind of resolve that, at least as to the deputies, is that you kind of focus on qualified immunity's requirement that the clearly established law precedes the events underlying the claim. So every case that precedes the event underlying this claim would have applied Farmer. So effectively, that's how the Farmer framework could fit into this case as to the deputies, sliding it into the clearly established prong. So that kind of the failure of plaintiff to cite clearly established law for the purposes of qualified immunity resolves the deliberate indifference claims against the individual deputies. On the Monell claim, as we briefed, there's at least three different ways, three reasons that the district court's judgment on that issue has to be affirmed. The first is that the estate abandoned that claim by not filing a response to the county and sheriff's motion for summary judgment. This is the necessary conclusion based on this court's precedent, as the court articulated in Brown v. VHS of Michigan. The estate tries to sidestep this conclusion by saying the district court had to make an independent finding as to the threshold issue of the summary judgment framework. But the magistrate judge did do that. The magistrate judge said, you know, I've examined the record, and I found that the county and the sheriff have carried their burden at summary judgment. That finding's at ECF number 141, page ID 3-119. The estate objected to that finding, and the district court concluded the estate's three-sentence objection, did not point to any evidence that would prevent summary judgment on the Monell claim in the county and the sheriff's favor. The second reason is that there's no underlying constitutional violation. We, for the Monell claim, so the Monell claim must fail, we briefed this extensively. I'm happy to discuss the objective component and the subjective component and causation as to my client. We agree with Mr. Cardello that this is an inadequate treatment case that requires verifying medical evidence be placed in the record. There is none. We also would note that on the subjective prong as to each deputy, I think everybody agrees that whenever it was appropriate, the deputies involved medical in this case. They called medical. Medical came down, examined Mr. Maslowski, determined the appropriate course of action in their medical judgment, and the deputies reasonably relied on that medical judgment. And then the third reason that the Monell claim must fail is that there's simply no evidence that the county has an unconstitutional policy or practice. We have an expert opinion that compared our policies to best practices across the country and concluded that they were consistent with best practices. There's no evidence kind of on the other side of that issue to rebut it. And so for that reason, the Monell claim must necessarily fail. Finally, on the tax cost issues, as we described, the court lacks jurisdiction over this issue because plaintiff didn't file a separate notice of appeal as required by this court's precedent, specifically Beard v. AAA of Michigan. You know, I'll note that when we pointed this out in our briefing, the estate provided no argument in response to this jurisdictional defect in its reply brief, so I'm not even sure if that's really a contested issue anymore as we stand here today. Even if the court had jurisdiction, however, the court reviews that decision for an abuse of discretion. The only error that the estate is alleging in that decision is the failure to consider the estate's representative's indigency. If you read the two orders that the district court issued on this issue, you'll note that in both, definitely in the denial of the motion for reconsideration, it explained its reasoning. It explained how it treated the estate's indigency argument. It fully considered the indigency issue, and the reason that the district court disallowed the cost was effectively that the estate didn't meet its evidentiary burden to properly disallow costs. So those three issues, qualified immunity, that knocks out the deliberate indifference claim against the deputies. The three issues that I discuss on Monell liability, you know, any one of those knocks out the minority claim, Monell liability claim against the county and the sheriff, and then the lack of jurisdiction as to the tax cost issues resolves the final issue as to the Kent County defendants. For those reasons and the reasons articulated in our brief, we'd ask the court to affirm. Okay, thank you very much. And we'll go ahead and hear the rebuttal. Thank you very much. Ready?  Very simply, this case should have gone to the jury. This is an obvious medical needs case with escalating symptoms. A reasonable jury could find a reckless failure to respond to an obvious and escalating medical emergency. The doctor was never called. District court erred by taking this question from the jury. Napier applies to non-obvious situations. Blackmore says it's obvious, no expert, no medical verifying evidence is required in the record. So I think we clear that obstacle. The symptoms here showed the existence of a sufficiently serious medical condition that was so obvious that even a layperson would recognize the need for a doctor's attention. Not only was he throwing up, the only treatment he did get was for his back pain for a hernia, and that was the Tylenol and the Excedrin that they switched from one to the other. But there was never anything that addressed his hallucinations, his flashing lights, his report of having received a concussion. That alone, combined with the obvious manifestation of symptoms, was obvious to a layperson. The corrections officers and the nurses should have been aware of it. So we meet this objective under Blackmore. The reliance on medical, when vomiting and seizure-like symptoms occurred, that reliance stopped. The former assessment then, the reliance that the COs had on the former assessment became unreasonable. Further, the care, even some care, is not enough when there are, when that's coupled with escalating symptoms that are not addressed. The adequacy of the treatment is something for the jury to determine. Finally, this is not a case about whether the outcome would have changed. All of the experts on the other side are trying to say, well, he was going to die anyway. What's the difference? That's not what the law says. This is about weeks of preventable suffering. He told people that he was hurt. They knew he wasn't acting right, and they failed in their constitutional obligation to escalate his care, to have him seen by a doctor, to have him seen by a medical professional that could have alleviated or minimized the obvious risk that he was exposed to. At a minimum, the record presents genuine issues and disputes of material fact, and they should have gone to a jury. So we are asking this court to reverse and remand. I know your time's almost up. Do you mind addressing the jurisdictional question about costs that your friend raised? Yep. It is discretionary. And the costs are discretionary. Our jurisdiction doesn't get so discretionary. I'm sorry? The costs may be an abuse of discretion standard, but I'm asking you about our jurisdiction to review it, given that there is no separate notice of appeal. Oh, I've got you on that. I believe that you guys can take up anything that's in dispute at this point, and that's just part and parcel of it. If we win, it kind of would become moot because it's only for the prevailing party. And I apologize. I misunderstood. It was the abuse of discretion standard for the judge's award. But do you have jurisdiction to hear that issue right here and now? I think you do. Okay. Thank you very much. Thank you to both parties for your arguments. The case will be submitted.